UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BARRETT PURDUM ET AL, | No. C-13-04816 DMR |
|     Plaintiffs, | **ORDER DENYING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |
|     v. | |
| DAVID WOLFE, | |
|     Defendant. | |

This matter comes before the court on Plaintiffs Barrett Purdum, Michael Armenta, and Michael Maher's motion for a preliminary injunction. [Docket No. 16.] The court held a hearing on January 9, 2014, during which the parties were given an opportunity to present oral argument. For the reasons stated below and at the hearing, Plaintiffs' motion is denied.

**I. Background/Facts**

This case involves a dispute regarding the ownership and control of Olivers Apparel, LLC ("Olivers"), a San Francisco start-up specializing in the manufacture and retail of high-end men's shorts. Plaintiffs are Barrett Purdum, Michael Armenta, and Michael Maher, who are the co-owners and founders of an established San Francisco men's clothing company named Taylor Stitch, LLC ("Taylor Stitch"). Plaintiffs joined forces with Defendant David Wolfe to develop Olivers.

All parties dispute the facts of Olivers' founding. According to Plaintiffs, Maher had plans to develop a high-end men's short, but did not have the time to devote to the logistics of a start up

venture. (Maher Decl., Nov. 20, 2013, ¶¶ 4, 5.) Maher "came to know Wolfe" and the two discussed the idea. (Maher Decl. ¶ 6.) Wolfe had the available free time to devote to a possible venture, while Maher, Purdum, and Armenta had the requisite knowledge to manufacture and design the product. Accordingly, the parties reached a "hand-shake" agreement whereby they agreed to go into business together to form Olivers. (Maher Decl. ¶¶ 7-9.) The parties also agreed to run a crowdfunding campaign on Kickstarter, an online funding platform, to raise capital for the new venture. (Maher Decl. ¶ 23.)

According to Wolfe, in approximately February 2013, he alone formed the idea for a company that would manufacture and sell its own brand of high-end men's athletic apparel, with a focus on shorts. (Wolfe Decl., Dec. 9, 2013, ¶¶ 5, 8.) He discussed his idea with some friends who encouraged him, (*see* Koosed Decl., Dec. 8, 2013, ¶¶ 2-4), and ultimately decided to go forward with starting a company. Wolfe sought guidance from individuals with experience in the menswear industry, and contacted a friend, Zack Kass, to discuss his idea, knowing that Kass was friendly with Plaintiff Maher and hoping that Kass could introduce the two. (Wolfe Decl. ¶¶ 6, 7.) On April 15, 2013, Wolfe, Maher, and Kass met at Kass's apartment and discussed various business ideas, including Wolfe's idea for a men's athletic apparel company focusing on men's shorts. (Kass Decl., Dec. 9, 2013, ¶¶ 8, 9.) Wolfe also shared with Maher and Kass his plan to launch and fund the venture on Kickstarter. (Wolfe Decl. ¶ 8.)

Wolfe and Maher met again regarding Olivers on April 23, 2013, and in May 2013, Maher invited Purdum and Armenta to join the venture. (Maher Decl. ¶ 10, Ex. 1 (4/23/13 meeting notes); Wolfe Decl. ¶ 11.) According to Wolfe, at some point the parties agreed that Plaintiffs would become equity holders in Olivers and that their equity would be tied to the time and effort they contributed to Olivers. (Wolfe Decl. ¶ 12.) All four individuals met on June 4, 2013 and agreed to a 50/50 partnership structure which would be non-binding and in place only through the Kickstarter campaign to raise investor money. (Maher Decl. ¶ 11, Ex. 2 (6/4/13 meeting notes).) Regarding the 50/50 equity split, Wolfe asserts that he would hold a 50% equity stake while Plaintiffs would each hold a 16.66% stake. (Wolfe Decl. ¶ 23.) The four met again on June 12, 2013. The meeting notes indicate that the parties discussed a 50/50 partnership through the Kickstarter campaign, with the

1  "LLC/Operating Agreement/Trademark" to be in place by July 31, 2013.  (Maher Decl. ¶ 12, Ex. 3
2  (6/12/13 meeting notes).)  The July 25, 2013 meeting notes discuss a "50/50 on everything through
3  the Kickstarter campaign," with an LLC Operating Agreement in place by July 31.  The notes
4  describe the "California LLC" as "Multiple Members, Sole Member has certain voting rights," with
5  a vesting period of "1 year cliff, 4 year vest."  (Maher Decl. ¶ 13, Ex. 4 (7/25/13 meeting notes).)
6  According to Wolfe, the parties agreed that Wolfe would be the lone manager and president of the
7  LLC.  (Wolfe Decl. ¶ 23.)

8  On July 31, 2013, Wolfe submitted Olivers' Articles of Organization of a Limited Liability
9  Company to the California Secretary of State.  (Wolfe Decl. ¶ 25; Maher Decl. ¶ 15, Ex. 5 (Articles
10 of Organization.)  The Articles of Organization states that the LLC will be managed by "one
11 manager," who is not identified on the form, and lists Taylor Stitch's business address, 334 South
12 Van Ness Avenue, as Olivers' address.  (Articles of Organization.)  Wolfe signed the document as
13 "Organizer."  (Articles of Organization.)

14 According to Wolfe, in July and August 2013, the parties contacted vendors and
15 manufacturers to negotiate purchase orders and agreements for the individual components of
16 Olivers' shorts, and worked collaboratively to create images, logos, marks, slogans, websites, and
17 other visual assets promoting the Olivers brand and product.  (Wolfe Decl. ¶¶ 32-33.)  Wolfe asserts
18 that the parties understood that all intellectual property used or published by Olivers "was created
19 specifically for and on behalf of Olivers."  (Wolfe Decl. ¶ 33.)

20 The parties launched Olivers' Kickstarter campaign on August 10, 2013, with the goal of
21 raising $10,000.  (Maher Decl. ¶¶ 33, 34; Wolfe ¶ 30.)  The Kickstarter site featured a short video
22 created by a production company assembled and hired by Wolfe.  (Wolfe Decl. ¶¶ 13-17.)  The
23 video features each of the four founders and represents to investors that the founders have "five
24 years experience running a tailored men's wear company."  (Maher Decl. Ex. 9.)  The campaign was
25 an enormous success, and in thirty days, Olivers raised $271,043 from 3,307 individuals.[1]  (Maher
26 Decl. ¶ 35.)  Maher had advertised Olivers to Taylor Stitch's database of customers, and according

---

[1] In exchange for pledges, investors were promised rewards, such as keychains, Olivers shorts, and duffel bags.  (Maher Decl. Ex. 7 (Kickstarter web pages).)

3

to Maher, many of the investors were Taylor Stitch customers. (Maher Decl. ¶ 36.) The success of the campaign drew immediate media attention. (Maher Decl. ¶ 37.)

Wolfe asserts that around the time of the launch of the Kickstarter campaign in early August 2013, Plaintiffs asked to renegotiate the parties' 50/50 division of equity in Olivers. Wolfe reluctantly agreed to a new division of 40% for Wolfe and 20% for each Plaintiff. (Wolfe Decl. ¶¶ 26, 27.) In a document titled "Olivers Operating Agreement Parameters Agreed to on 8/13/2013," the parties set forth their new agreements about the division of labor and equity in the company. The equity split was 20% each for Armenta, Maher, and Purdum, and 40% for Wolfe, with a one-year cliff, four-year vest schedule. (Maher Decl. ¶¶ 17-19, Ex. 6 (Operating Agreement Parameters); Wolfe Decl. ¶ 28.) Under this schedule, the "equity split would not begin to take effect for one year and would not fully vest for four years." (Wolfe Decl. ¶ 23 (emphasis removed).) According to Wolfe, this vesting scheme was put in place to ensure that the parties would devote time and effort to Olivers for at least one year; if a person left Olivers before one year, they would do so without equity. (Wolfe Decl. ¶ 23.) Maher describes the provision slightly differently, stating that under the vesting scheme, "no individual's equity would become immediately alienable." (Maher Decl. ¶ 19.) Voting rights were split 16 2/3% each for Armenta, Maher, and Purdum, and 50% for Wolfe. In addition, the parties set forth expected time commitments: 20 hours per week for Armenta, Maher, and Purdum, and 50 hours per week for Wolfe.[2] (Maher Decl. ¶¶ 20-21, Operating Agreement Parameters.)

Following the unexpected success of the Kickstarter campaign, Plaintiffs assert that "[n]egotiations on the final Operating Agreement became contentious and the partnership between Plaintiffs and Wolfe soured." (Maher Decl. ¶ 44.) On Friday, September 6, 2013, Purdum sent an email to Wolfe, copying Maher and Armenta. (Maher Decl. Ex. 15.) In the email, Purdum lays out two options for Wolfe: under "Option A," Purdum wrote that "[w]e stop all work on OLIVERS.

---

[2] Wolfe claims that he asked that Plaintiffs make a time commitment to Olivers in exchange for the increase in equity because of concerns "due to Plaintiffs' lack of involvement in Olivers up to [that] point," and that he had been doing the majority of the work. (Wolfe Decl. ¶ 28.) The parties dispute the level of each individual's actual involvement in the company. (*See* Guerra Decl., Dec. 8, 2013, ¶¶ 4-6; Maher Decl., Dec. 13, 2013 (Second Maher Decl.), ¶¶ 4, 7.)

4

1 This includes including web, production, press and media." Wolfe would take 100% of the
2 company, and Plaintiffs would take 60% of the profits from Kickstarter sales and claim all assets
3 such as "name, logo and mark, pattern and all visual assets created" to that date. (Maher Decl. Ex.
4 15.) Purdum also wrote that as of the following Monday morning (September 9, 2013), Wolfe
5 would not hold an office at 334 South Van Ness, the business address for both Taylor Stitch and
6 Olivers. "Option B" was for Wolfe to "relinquish day-to-day participation in OLIVERS, [his]
7 current stake as stated in [the] written agreement, and [his] vote." Plaintiffs would continue to run
8 the company and carry out production. Wolfe would receive 5% of Olivers, vesting immediately,
9 and 40% of the profits from the Kickstarter campaign, and would be "immediately relieved of any
10 and all duties going forward." (Maher Decl. Ex. 15.) Purdum asked Wolfe to think the proposal
11 through over the weekend and noted, "we can discuss on Monday." (Maher Decl. Ex. 15.)
12 According to Wolfe, the September 6 email "took [him] by complete surprise," because he "was not
13 under the impression that Plaintiffs and [he] were having difficulty working together," and thought
14 the parties were close to finalizing an operating agreement. (Wolfe Decl. ¶ 40.)

15 On Monday, September 9, 2013, Plaintiffs received a letter from Wolfe's attorney in which
16 he stated that the "demands and/or proposals contained in the September 6, 2013 email constitute an
17 express and unequivocal repudiation and disavowal of any agreement [Plaintiffs] have or may have
18 had with Mr. Wolfe and/or Olivers." (Maher Decl. ¶¶ 46, 47, Ex. 16.) The attorney further
19 informed Plaintiffs that Olivers was a "single member limited liability company . . . founded by Mr.
20 Wolfe and is the sole and exclusive property of Mr. Wolfe," and that all intellectual property and
21 trade secrets created on behalf of Olivers was the "sole and exclusive property of Olivers." (Maher
22 Decl. Ex. 16.) Plaintiffs discovered that Wolfe had changed the passwords to the Kickstarter page,
23 all of Olivers' social media pages, and Olivers' bank accounts containing the $270,000 in
24 Kickstarter funds. (Maher Decl. ¶ 48.) However, Wolfe did not disclose these changes to the
25 approximately 3,300 Kickstarter investors. Instead, he continued to communicate with investors on

5

the Kickstarter page using the name "David W, Barrett P, Mike M, Mike A."[3]  (Maher Decl. ¶ 51, Ex. 17.)

Since September 6, 2013, Wolfe has been running Olivers alone, without Plaintiffs' involvement.  (Wolfe Decl. ¶ 42.)  On October 15, 2013, Olivers filed a lawsuit against Plaintiffs and Taylor Stitch in San Francisco Superior Court, alleging that Plaintiffs have been interfering with Olivers' supply chain.  Olivers claimed that it had negotiated contracts with vendors prior to the September 2013 split between the partners, and that the Taylor Stitch partners had spread misinformation about Olivers in order to disrupt its manufacturing process and interfere with its business ("Olivers' suit").  (Szor Decl., Dec. 9, 2013, ¶ 3.)  Olivers' suit contains causes of action for intentional interference with prospective economic advantage, tortious interference with contract, and a UCL claim.  (Szor Decl., ¶ 2.)  On October 17, 2013, the state court issued a TRO against Plaintiffs and Taylor Stitch, barring them from, *inter alia*, interfering with Olivers' existing business contracts.  The court scheduled a hearing on November 5, 2013 for Plaintiffs to show cause why a preliminary injunction should not issue.  (Szor Decl. ¶ 5.)  The November 5 hearing was continued to November 20, and on November 14, 2013, Plaintiffs removed Olivers' suit to this court where it is pending as case 4:13-cv-05284 DMR, *Olivers Apparel, LLC v. Purdum et al*.  (Szor Decl. ¶¶ 6, 7.)

In this motion, Plaintiffs seek an order 1) enjoining Wolfe from selling any shorts manufactured without Plaintiffs' assistance; 2) ordering Wolfe to turn over the passwords to Olivers' social media and bank accounts "so that Plaintiffs may again have the ability to rightfully control the company that they co-founded and partially own"; 3) enjoining Wolfe from using photographs copyrighted by Armenta; and 4) enjoining the use of the Olivers trademarks.

## II. Legal Standard

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011) (quoting *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 24 (2008)).  A plaintiff seeking a preliminary injunction must show (1) a

---

[3] Wolfe asserts that he has attempted to remove Plaintiffs' names from the Kickstarter page but pursuant to Kickstarter policy, the names in the "project by" section cannot be altered following the launch of a campaign.  (Wolfe Decl. ¶ 47.)  It does not appear that Wolfe has attempted to communicate to investors that Plaintiffs have not been involved in Olivers since September 2013.

likelihood of suffering irreparable harm in the absence of a preliminary injunction, (2) a likelihood of success on the merits, (3) that the balance of equities tips in the movant's favor, and (4) that an injunction would serve the public interest. *Id.* (quoting *Winter*, 555 U.S. at 20). In the Ninth Circuit, courts evaluate these factors on a sliding scale; a court may issue a preliminary injunction on less than a likelihood of success on the merits, if Plaintiff demonstrates "serious questions going to the merits and a balance of hardships that tips sharply towards the plaintiff . . . so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *Id.* at 1135 (quotation marks omitted). "In deciding a motion for preliminary injunction, the district court 'is not bound to decide doubtful and difficult questions of law or disputed questions of fact.'" *Int'l Molders' and Allied Workers' Local Union No. 164 v. Nelson*, 799 F.2d 547, 551 (9th Cir. 1986) (citing *Dymo Indus., Inc. v. Tapewriter, Inc.*, 326 F.2d 141, 143 (9th Cir. 1964)). Correspondingly, the court's factual findings and legal conclusions when evaluating the merits of a preliminary injunction motion "are not binding at trial on the merits." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981).

### III. Discussion

#### A. Likelihood of Success on the Merits

Plaintiffs argue that they are likely to succeed on each of five claims[4] against Wolfe: breach of contract, breach of fiduciary duties, unfair competition, trademark infringement, and copyright infringement. Plaintiffs assert that their breach of contract, breach of fiduciary duties, and unfair competition claims all arise under the same conduct by Wolfe, and therefore discuss them together. However, as the elements for each cause of action are different, the court will address each claim separately.

##### 1. Breach of Contract

Plaintiffs first argue that they are likely to succeed on their breach of contract claim. The elements of a cause of action for breach of contract are "(1) the existence of the contract, (2)

---

[4] Plaintiffs bring seven total causes of action in their amended complaint. They do not address their tortious interference with prospective economic advantage and false or misleading statements claims in this motion.

7

plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) the resulting damages to the plaintiff." *Oasis W. Realty, LLC v. Goldman*, 51 Cal. 4th 811, 821 (2011).

Plaintiffs point to the evidence of an agreement between the parties, including the meeting notes and the August 13, 2013 Operating Agreement Parameters document, that set forth the parties' equity stakes, voting rights, and expected time commitments to Olivers. They argue that Wolfe breached the Operating Agreement Parameters when he unilaterally terminated Plaintiffs from Olivers by changing all of the passwords for Olivers' social media sites and Kickstarter page and taking sole control of Olivers' bank account. (Pls.' Mot. 8.)

Wolfe does not dispute that there was an agreement between the parties, as memorialized in the Operating Agreement Parameters document. However, he argues that Plaintiffs will be unable to prevail on their contract claims for two reasons. First, Plaintiffs must show that they performed their obligations under the parties' agreement. According to Wolfe, this will be difficult as the September 6, 2013 email shows that "Plaintiffs were *unwilling* to perform the terms of the Agreement," as they stated they would either stop all work on Olivers or Wolfe would relinquish his stake in the company. (Def.'s Opp'n 18-19 (emphasis in original).) Wolfe emphasizes that the Operating Agreement required Plaintiffs to each devote one year of work to Olivers at the rate of twenty hours per week before beginning to accrue equity in the company, and appears to base his argument that they "expressly refused to perform" under the agreement on the fact that one of the two options was for Plaintiffs to stop working on Olivers altogether. (*See* Def.'s Opp'n 19.) Second, Wolfe argues that Plaintiffs have not shown evidence of a breach by Wolfe. Specifically, he argues that Plaintiffs' September 6 email was an anticipatory breach of the parties' agreement, and that his actions in locking Plaintiffs out of Olivers were a lawful reaction to Plaintiffs' breach.

Both of Wolfe's arguments highlight a significant dispute of fact. Wolfe argues that the September 6 email indicates that the Plaintiffs cannot show that they performed under the agreement – that they "expressly refused to perform" – and that the email constituted an anticipatory breach. But whether either assertion is true depends on Plaintiffs' intentions in sending the email to Wolfe.

"A party asserting express anticipatory repudiation must demonstrate that (1) the other party absolutely and unequivocally refused to perform and (2) it (the party asserting anticipatory

repudiation) effectuated the other party's breach by materially changing its position and treating the repudiation as final." *Shahani v. United Commercial Bank*, 457 B.R. 775, 783 (N.D. Cal. 2011) (citing *Guerrieri v. Severini*, 51 Cal. 2d 12, 19 (1958)). While a party's "willingness to negotiate an offer of performance at variance with the terms of the agreement demonstrates the offering party's intention to abide by the contract and does not result in an anticipatory breach . . . an offer to engage in 'negotiations' at which the offeror will merely reiterate his demands or withdraw them on a condition he has no right to impose, is not sufficient to prevent an anticipatory breach from occurring." *Pac. Coast Eng'g Co. v. Merritt-Chapman & Scott Corp.*, 411 F.2d 889, 895 (9th Cir. 1969) (citations omitted). Whether "a party has committed an anticipatory breach by repudiating the contract" is a question of fact. *Id.* at 894 (citing *Gold Mining & Water Co. v. Swinerton*, 23 Cal. 2d 19, 28 (1943)).

On this record, it appears (and Plaintiffs do not dispute) that Wolfe meets the second prong of the anticipatory breach analysis; he treated the September 6 email as a final repudiation as demonstrated by the fact that he materially changed his position and locked out Plaintiffs from the company. But the question raised by the first prong– whether Plaintiffs "absolutely and unequivocally refused to perform"– is not clear on the current record. On one hand, the email could be seen, as Wolfe argues, as a final, unequivocal statement that Plaintiffs refused to go forward under the terms of the parties' agreement. Neither of the two options presented by Plaintiffs contemplates an arrangement where all four principals would continue to work on Olivers together. Under Option A, Wolfe would operate the company alone and under a different brand name, as Plaintiffs demanded that Wolfe proceed without the "name, logo and mark, pattern and all visual assets created to this juncture." Under Option B, Olivers would go forward but without Wolfe, who would have to relinquish all duties, voting rights, and day to day participation, but would receive a 5% interest in the company. Both of Plaintiffs' options include a 60/40 (Plaintiffs/Wolfe) split of the Kickstarter funds.

On the other hand, facts may develop to support Plaintiffs' position. It is possible that Plaintiffs intended to engage in further negotiation of the Operating Agreement parameters, and that their email simply reflected a hard-ball "divorce is the only answer" negotiating position.

9

Resolution of this dispute turns on the parties' intentions, actions, and responses; the record contains limited facts on these points. The only evidence regarding Plaintiffs' intentions is Maher's statement that "[n]egotiations on the final Operating Agreement became contentious and the partnership between Plaintiffs and Wolfe soured," and that Purdum subsequently sent the September 6 email. (Maher Decl. ¶¶ 44-45.) In their reply, Plaintiffs submit a second declaration by Maher in which he states that he discussed "alternative business arrangements with Wolfe" at the beginning of September, and that he sent Wolfe an email on September 6 (which is not attached to his declaration). (Maher Decl., Dec. 13, 2013 (Second Maher Decl.), ¶¶ 8-9.) He continues, "[w]e all agreed that we would think about the future of the business over that weekend and come up with a plan to move forward with Olivers." (Second Maher Decl. ¶ 9.) However, Maher's statements are directly contradicted by Wolfe's declaration, in which Wolfe states that the September 6 email "took [him] by complete surprise [because he] was not under the impression that Plaintiffs and [he] were having difficulty working together," and that he thought the parties were close to a final operating agreement. (Wolfe Decl. ¶ 40.)

Ultimately, whether Wolfe's actions constituted a breach of the parties' agreement or a reaction to Plaintiffs' anticipatory breach is a disputed question of fact that lies at the heart of Plaintiffs' breach of contract claim. The court "is not bound to decide doubtful and difficult questions of law or disputed questions of fact" in deciding a motion for preliminary injunction. *Int'l Molders'*, 799 F.2d at 551 (internal citation omitted). As the record before the court is limited, the court declines to resolve this factual dispute, and accordingly finds that Plaintiffs have failed to demonstrate a likelihood of success on the merits on this claim. *See, e.g., SoftMan Prods. Co, LLC v. Adobe Sys.*, 171 F. Supp. 2d 1075, 1093 (C.D. Cal. 2001) (holding that defendant had not shown likelihood of success on trademark infringement claim where "each party [made] opposing representations as to" whether the first sale doctrine applied; concluding that "questions of fact predominate[d] as to the central issue"); *Hansen Beverage Co. v. Vital Pharm., Inc.*, No. 08-CV-1545 IEG (POR), 2008 WL 5427601, at *4 (S.D. Cal. Dec. 30, 2008) (holding that plaintiff failed to demonstrate likelihood of prevailing on false advertising claim where there were numerous disputes of facts precluding finding of literal falsity; declining to resolve disputes on limited record).

### 2. Breach of Fiduciary Duty

The elements of a cause of action for breach of fiduciary duty are (1) the existence of a fiduciary relationship, (2) breach of fiduciary duty, and (3) damages. *Oasis W. Realty*, 51 Cal. 4th at 821.

Plaintiffs do not separately discuss the basis for this claim, stating only that "Wolfe breached his fiduciary duty to Plaintiffs as well as the [Operating Agreement Parameters] by unilaterally terminating Plaintiffs from Olivers." (Pls.' Mot. 8.) Plaintiffs only provide support for this claim in their reply, citing a repealed provision of the California Corporations Code which provides that "[i]f a member's economic interest in the limited liability company is terminated *pursuant to the operating agreement*, the member may demand and shall be entitled to receive a return of that member's contribution." Cal. Corp. Code § 17100(c) (repealed) (emphasis added). In addition, it is unclear whether the terms of that statute would have applied here, as there was no operating agreement in place. Given that Plaintiffs did not specifically address or support this cause of action in their motion, the court finds that they have not met their burden of demonstrating a likelihood of success on the merits.

### 3. Unfair Competition

California's unfair competition law (UCL), California Business and Professions Code section 17200, prohibits "any unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200. The UCL "establishes three varieties of unfair competition—acts or practices which are unlawful, or unfair, or fraudulent." *Cel-Tech Comms. Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 180 (1999). "It governs anti-competitive business practices as well as injuries to consumers, and has as a major purpose the preservation of fair business competition." *Id*. (internal quotation marks and citation omitted).

As with their breach of fiduciary duty claim, Plaintiffs do not specifically address their UCL claim in their moving papers, and the basis for the claim is unclear. In their amended complaint, Plaintiffs allege that Wolfe's acts "as complained herein, constitute unfair competition." (Am. Compl. ¶ 82.) It appears that Plaintiffs allege that Wolfe's actions fall under the "unfair" prong of the UCL, as they do not allege that his actions were unlawful or fraudulent. However, they do not

11

1  specify whether their UCL cause of action is based upon their breach of contract or breach of
2  fiduciary duty claim, or both.  Unfair conduct means "conduct that threatens an incipient violation of
3  an anti-trust law, or violates the policy or spirit of one of those laws because its effects are
4  comparable to or the same as a violation of the law, or otherwise significantly threatens or harms
5  competition." *Cel-Tech Comms.*, 20 Cal. 4th at 187.  "[A]ny finding of unfairness to competitors
6  under section 17200 [must] be tethered to some legislatively declared policy or proof of some actual
7  or threatened impact on competition." *Id*. at 186-87.  Again, given that Plaintiffs did not specifically
8  address or support this cause of action in their motion, the court finds that they have not shown a
9  likelihood of success on the merits of their UCL claim.

### 4. Trademark Infringement Claim

11  Plaintiffs next assert a trademark infringement claim pursuant to 15 U.S.C. § 1125(a) due to
12  Wolfe's allegedly improper use of the Olivers marks.

13  Section 43(a) of the Lanham Act prohibits any person from using "any word, term, name,
14  symbol, or device, or any combination thereof, or any false designation or origin, false or misleading
15  description of fact, or false or misleading representation of fact," which is "likely to cause
16  confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such
17  person with another person, or as to the origin, sponsorship, or approval of his or her goods,
18  services, or commercial activities by another person."  15 U.S.C. § 1125(a)(1).  In order to prevail
19  on a claim for trademark infringement, a plaintiff must prove "(1) that it has a protectible ownership
20  interest in the mark; and (2) that the defendant's use of the mark is likely to cause customer
21  confusion."  *Rearden LLC v. Rearden Commerce, Inc.*, 683 F.3d 1190, 1202 (9th Cir. 2012)
22  (quotation marks and citation omitted).

23  Plaintiffs do not discuss the elements of an infringement claim, nor do they explicitly assert
24  that they own a valid trademark which Wolfe is infringing.  Instead, they argue that trademark law
25  focuses on protecting consumers from confusion, and that the purpose of trademark protection is to
26  ensure that the public "will get the product which it asks for and wants to get." (Pls. Mot. 9-10
27  (citation omitted).)  They argue that the consumer goodwill associated with the Olivers marks is
28  based upon, at least in part, Plaintiffs' five years of experience in menswear apparel with Taylor

1 Stitch, given that Olivers repeatedly touted this fact during the Kickstarter campaign. According to
2 Plaintiffs, this aspect of the goodwill associated with the Olivers marks has been removed by Wolfe
3 without his informing the Kickstarter funders. In other words, Plaintiffs' position appears to be that
4 trademark infringement occurs when an element of the goodwill associated with the trademark has
5 been altered or no longer exists. Accordingly, Plaintiffs argue, they have shown "a likelihood of
6 success on their trademark claim regarding Wolfe's improper use" of the Olivers marks. (Pls.' Mot.
7 12.)
8       Wolfe argues that Plaintiffs are not likely to succeed on this claim because they cannot show
9 an infringing use on Defendant's part. As the founder of Olivers and the only individual currently
10 running the business, Wolfe claims he is clearly authorized to use the Olivers marks to advance and
11 promote the business. Absent an infringing use, Wolfe claims Plaintiffs' trademark infringement
12 cause of action cannot succeed.
13       The court finds that Plaintiffs have not met their burden of demonstrating that they are likely
14 to succeed on this claim. First, Plaintiffs provide little evidence to support their claim that the
15 goodwill associated with Olivers is based upon their experience with Taylor Stitch, such as the
16 actual number of Kickstarter funders who are also Taylor Stitch customers, or whether some
17 significant number of Olivers' crowdfunding supporters relied on the fact of Plaintiffs' participation
18 in deciding to invest in Olivers. Therefore, any argument that Olivers' goodwill is based upon
19 Plaintiffs' involvement is conjectural and conclusory.
20       Moreover, Plaintiffs do not cite any cases to support the claim that a trademark infringement
21 action may be based upon this type of alleged change in a mark's goodwill. Instead, all of the cases
22 cited by Plaintiffs address *assignments* of trademarks "in gross," which is "[a] sale of a trade name
23 or mark divorced from its goodwill." *See, e.g., Marshak v. Green*, 746 F.2d 927, 929 (2d Cir. 1984);
24 *Money Store v. Harriscorp Finance, Inc.*, 689 F.2d 666, 676 (7th Cir. 1982); *Green River Bottling*
25 *Co. v. Green River Corp.*, 997 F.2d 359, 362 (7th Cir. 1993). In those cases, the courts addressed
26 whether an assignment of a trademark was "in gross" or whether it conferred the goodwill of the
27 mark or business and thus conferred rights under the Lanham Act. For example, in *Green River*, the
28 plaintiff, a soft drink distributor, sold one of its soft drinks, including its trademark, "Green River,"

13

1 and the secret formula, to the defendant under a purchase agreement in which the defendant would
2 make periodic payments to the distributor. 997 F.2d at 360. After the defendant fell behind in its
3 payments, the distributor demanded the return of the formula, but the defendant continued to sell a
4 soft drink under the Green River name, but using a different soft drink formula. *Id*. The defendant
5 moved for a preliminary injunction, arguing that it alone was entitled to use the trademark even if it
6 had defaulted under the purchase agreement, because it owned the mark. The Seventh Circuit
7 affirmed the lower court's denial of preliminary injunction, noting that "[a] trademark cannot be sold
8 'in gross,' that is, separately from the essential assets used to make the product or service that the
9 trademark identifies. The discontinuity would be too great. The consumer would have no assurance
10 that he was getting the same thing (more or less) in buying the product or service from its new
11 maker. . . . [t]he trademark was to stay with the formula – the essential asset in the production" of
12 the Green River soda. *Id*. at 362 (citations omitted).

13   *Green River* is inapposite here. In *Green River*, the plaintiff created and deployed a mark,
14 and developed customer goodwill in the mark as a result. The mark was then assigned to a third
15 party who associated it with a fundamentally changed product, thereby falsely trading on the
16 goodwill of the mark. Here, there has been no sale or assignment of the Olivers marks to a third
17 party. Instead, the marks are being used by Olivers in connection with Olivers itself. Plaintiffs may
18 be attempting to argue that the Olivers mark was imbued with the goodwill brought by its three
19 Taylor Stitch founders, and that Wolfe's continued use of the Olivers mark without Plaintiffs'
20 involvement amounts to an infringing "assignment" of the mark because it dupes and confuses
21 Olivers' Kickstarter funders. The court need not reach this novel theory; as noted above, there is no
22 significant evidence in the record regarding the existence of goodwill or customer confusion.

23   Plaintiffs also cite *Intel Corporation v. Terabyte International, Inc.*, 6 F.3d 614, 619 (9th Cir.
24 1993), but this case does not support Plaintiffs' position. In *Intel*, the Ninth Circuit affirmed the
25 judgment of the lower court that the defendant, a computer components broker, was liable for
26 trademark infringement by distributing math coprocessors manufactured by the plaintiff which had
27 been relabeled from slow chips to faster, more expensive ones. *Id*. at 616. The defendant argued
28 that there was no trademark infringement because there was "no confusion as to the *source* of the

14

product, namely Intel," and that "'confusion as to capability' [was] irrelevant for purposes of liability." *Id*. at 619 (emphasis in original). The court held that the defendant's argument ignored the "good will, reputation, and consumer protection functions associated with a particular trademark," and that the purpose of trademark protection is so that the public may rely upon the mark to "get the product which it asks for and wants to get." *Id*. (quotation marks omitted) (quoting *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 782 n.15 (1992)). While this case supports the concept that trademark protections encompass the goodwill function of a trademark, it does not support Plaintiffs' position that infringement of a trademark occurs when an alleged element of the goodwill associated with the trademark has been altered or no longer exists, especially since Plaintiffs have not established the existence of the goodwill that they claim is associated with the mark. Accordingly, as Plaintiffs' have not shown an infringing use of the Olivers marks by Wolfe at this juncture, they have not shown that they are likely to prevail on their trademark infringement claim.

### 5. Copyright Infringement Claim

Plaintiffs' final claim is for copyright infringement based upon Wolfe's use of photographs copyrighted by Armenta on social media pages, Kickstarter, and the Olivers website. At the hearing, counsel represented that Wolfe has removed all of the images at issue and Wolfe is "unequivocal that Olivers will not use or publish these images in the future." (Def.'s Opp'n 20, Wolfe Decl. ¶ 34.) Plaintiffs' counsel confirmed that the copyright infringement claim is no longer a basis for a preliminary injunction. Therefore, this claim is moot for purposes of the preliminary injunction. *See Fed. Trade Comm'n v. Affordable Media*, 179 F.3d 1228, 1238 (9th Cir. 1999) (holding that the need for injunctive relief may become moot if defendants show that "'subsequent events [have] made it absolutely clear that the allegedly wrongful behavior cannot reasonably be expected to recur.'" (quoting *Norman-Bloodsaw v. Lawrence Berkeley Laboratory*, 135 F.3d 1260, 1274 (9th Cir. 1998))).

### B. Likelihood of Irreparable Harm

Even if Plaintiffs had shown a probability of prevailing on any their claims, the court finds that they have failed to show a likelihood of irreparable harm in the absence of a preliminary

injunction. *See Winter*, 555 U.S. at 22 (holding that in order to obtain an injunction, Plaintiffs must show that "irreparable injury is *likely* in the absence of an injunction." (emphasis in original)). Plaintiffs argue that the "irreparable injury stems from Wolfe's current manufacture and sale of shorts without the manufacturing expertise of the Plaintiffs." (Pls.' Mot. 12.) According to Plaintiffs, Wolfe's manufacture of shorts without Plaintiffs' expertise hurts Plaintiffs' reputation, because when a customer receives a "shoddily manufactured" short from Wolfe, the customer will believe the product was made by Plaintiffs as they are unaware that Plaintiffs were removed from Olivers. However, Plaintiffs have not presented any evidence of "shoddy manufacturing" by Wolfe, and thus Plaintiffs' theory of irreparable harm is purely speculative. As the Ninth Circuit recently held in *Herb Reed Enterprises, LLC v. Florida Entertainment Management, Inc.*, 736 F.3d 1239, 1249 (9th Cir. 2013), "a plaintiff must establish irreparable harm" in order to obtain a preliminary injunction in a trademark infringement case. While "[e]vidence of loss of control over business reputation and damage to goodwill *could* constitute irreparable harm," a plaintiff must establish such likelihood *with evidence*. *Id*. at 1250 (emphasis added). "Speculative injury cannot be the basis for a finding of irreparable harm." *In re Excel Innovations, Inc.*, 502 F.3d 1086, 1098 (9th Cir. 2007). Therefore, as Plaintiffs have not made any showing of the likelihood of irreparable harm, an injunction is not warranted.

## IV. Conclusion

For the foregoing reasons, Plaintiffs' motion for preliminary injunction is denied.

IT IS SO ORDERED.

Dated: January 15, 2014



_____
DONNA M. RYU
United States Magistrate Judge